830 P.2d 162

**GTE SOUTHWEST INCORPORATED, Plaintiff–Appellant,**

v.

**TAXATION AND REVENUE DEPARTMENT, Defendant–Appellee.**

**No. 12419.**

Court of Appeals of New Mexico.

Feb. 27, 1992.

Certiorari Denied April 8, 1992.

J.W. Neal, Neal & Neal, Hobbs, William H. Ballard, Irving, Tex., for plaintiff-appellant.

Carolyn A. Wolf, Special Asst. Atty. Gen., Taxation and Revenue Dept., Santa Fe, for defendant-appellee.

## OPINION

HARTZ, Judge.

GTE Southwest Incorporated (GTE) appeals from an order of the Taxation and Revenue Department (Department) denying its protest of an assessment for gross receipts tax and a penalty with respect to the reporting period from January 1, 1984, through December 31, 1986. The taxes were imposed on (1) receipts of payments from interstate telephone carriers for access to GTE's local telephone services; (2) receipts of payments from interstate carriers for ancillary services rendered by GTE, such as billing GTE customers for telephone service provided by interstate carriers; and (3) receipts of payments from GTE customers which are identified as pass-throughs of municipal franchise fees. We hold that the gross receipts tax was properly assessed on receipts for ancillary services and for pass-throughs of franchise fees, but no tax should have been assessed on receipts for access services. Of great assistance in our review of this case was the decision and order by hearing officer Gerald B. Richardson. Because his decision and order can serve as a model for administrative law rulings, we attach it as an appendix to this opinion. *See* William W. Bivins, *Findings and Conclusions: A Modest Proposal for Preparation Using a Different Technique*, 30 B.Bull.No. 48, at 4, (N.M.1991).

## I. ACCESS SERVICES

### A. Background

To explain access services, we begin with some history. The Modified Final Judgment (MFJ) entered in *United States v. American Telephone & Telegraph Co.*, 552 F.Supp. 131 (D.D.C.1982), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983), ordered American Telephone and Telegraph Company (AT & T) to divest its telephone subsidiaries effective January 1, 1984. As a result of the divestiture, the United States was divided into 161 "local access and transport areas" (LATAs). A company cannot provide telephone services both within LATAs and between LATAs. *See AT & T Communications v. Department of Revenue*, 778 P.2d 677, 678–79 (Colo. 1989) (en banc). InterLATA service is provided by such companies as AT & T, Sprint, and MCI. GTE provides intraLATA service. New Mexico is composed of only one LATA. Therefore, in New Mexico all intra-

state calls are intraLATA calls and all interstate calls are interLATA calls.

Under the new arrangement, an interLATA call consists of three components. A customer originates the call by sending the signal over the local exchange on equipment owned by an intraLATA company. The intraLATA company routes the call to a switching center operated by the customer's interLATA carrier. This is the originating link. The interLATA carrier then routes the signal over its long-distance lines and equipment to a switching center in the destination LATA. This is the intermediate link. Finally, the signal is switched from the interLATA carrier to the local exchange network owned by the intraLATA company serving the destination, and the local carrier routes the signal to the end-user receiving the call. This is the terminating link. *See id.; GTE Sprint Communications Corp. v. Department of Treasury,* 179 Mich.App. 276, 445 N.W.2d 476, 477 (1989); *GTE Sprint Communications Corp. v. Wisconsin Bell,* 155 Wis.2d 184, 454 N.W.2d 797, 799 (1990). If, for example, a GTE customer in Hobbs wishes to make a long-distance call via AT & T to someone in Dallas who uses Southwestern Bell as her local carrier, (1) the originating link routes the call over GTE equipment from the Hobbs customer to the AT & T switching center in Hobbs, (2) the intermediate link routes the call on AT & T equipment from Hobbs to the AT & T switching center in Dallas, and (3) the terminating link routes the call from the AT & T switching center over Southwestern Bell lines to the recipient of the call in Dallas. Physically, the process may be identical to what it was prior to divestiture, but the business entities involved and their relationships to one another are now likely to be radically different.

Under this new regime, the customer placing the long distance call pays the interLATA carrier for the long distance service. The interLATA carrier in turn must pay a charge to the intraLATA carriers at each end of the telephone call. "Access service" is defined by the Federal Communications Commission as including "services and facilities provided for the origination or termination of any interstate or foreign telecommunication." 47 C.F.R. § 69.2(b) (1990). The fee paid by the interLATA carrier to the intraLATA carrier for access to the local exchange network is called an access charge. *See* 47 C.F.R. ch. I., subch. B, pt. 69 (1990) (FCC rules for access charges).

GTE has paid and protested a gross receipts tax of $969,311.03 on access charges and a penalty of $114,446.53 arising from delay in paying the protested tax. The protested tax was assessed for receipts from access charges between January 1, 1984—the official date of the AT & T divestiture—and July 1, 1986—the effective date of an amendment to the New Mexico Gross Receipts and Compensating Tax Act that clearly deducted access charges from gross receipts. NMSA 1978, § 7-9-56(C) (Repl.1986); 1986 N.M. Laws, ch. 52, § 7 (effective date).

**B.  Discussion**

◼ The pertinent statutory provision is the following language from the version of NMSA 1978, Section 7-9-55 (Repl.Pamp.1983), in effect during the period at issue in this case:

> Receipts from transmitting messages or conversations by telegraph, telephone or radio other than from one point in this state to another point in this state ...

may be deducted from gross receipts. Reading the statutory provision today, it may seem ambiguous. The ambiguity concerns what is being modified by the words "other than from one point in this state to another point in this state." If the phrase is read as modifying the verb "transmitting," then the tax could be imposed with respect to a transmission between two points in New Mexico even if the message originated outside of New Mexico or was destined for a point outside of New Mexico. For example, when a call is placed from Hobbs to Dallas the tax could be imposed on a receipt for the transmission over GTE lines between the caller in Hobbs and the AT & T switching center in Hobbs. If, on the other hand, the phrase is read as modifying "messages or conversations," then

the tax could be imposed only if the message or conversation originated at one point in the state and was destined for another point in the state. Under this reading, the state could not impose the tax with respect to an intrastate component of the transmission of an interstate telephone conversation between New Mexico and another state.

The proper reading is set forth in our supreme court's decision in *Ealey v. Bureau of Revenue,* 89 N.M. 160, 548 P.2d 440 (1976). The State Bureau of Revenue attempted to impose a gross receipts tax on compensation Mrs. Ealey received as an agent for Western Union Telegraph Company in Farmington, New Mexico. She was paid seventy cents per message that she sent or received. She transmitted both intrastate and interstate messages. Interstate messages that she sent or received were relayed through the Western Union office in Albuquerque. Apparently the transfer of the message to or from the national wires was nearly automatic. The supreme court held that Mrs. Ealey's compensation with respect to interstate messages was exempt under Section 7–9–55, which was then codified as NMSA 1953, Section 72–16A–14.10 (Supp.1975). The pertinent language was identical to the language in effect during the taxing period at issue in this case. The court first held that Mrs. Ealey's compensation consisted of "receipts from transmitting messages." *Id.* at 161, 548 P.2d at 441. The court then stated that the language of the section "appears to us to be clear and unambiguous and is applicable to [Mrs. Ealey] insofar as she transmits interstate messages." *Id.* As we understand *Ealey,* if the message is an "interstate message," then a receipt from transmitting it is deductible from gross receipts, even if the receipt relates only to an intrastate component (say, from Farmington to Albuquerque) of the interstate transmission. In other words, *Ealey* read the statutory language "other than from one point in this state to another point in this state" as modifying "messages or conversations."

The Department attempts to distinguish *Ealey* on two grounds. First, it notes that

"Mrs. Ealey was an agent of Western Union, using the Western Union network to transmit the message." In contrast, GTE is independent of every interstate carrier. The *Ealey* opinion itself referred to Mrs. Ealey's status as an agent. The reference appears in the following passage:

[I]n unequivocal language the words "receipts from transmitting messages" describe [Mrs. Ealey's] position. In addition, she is an agent of Western Union and not an independent contractor. Her activities are vital to the only purpose involved, i.e., the transmission of messages, both interstate and intrastate.

*Id.* The opinion does not, however, explain why Mrs. Ealey's status as an agent was material to the result, nor does the Department provide an explanation. We do not read *Ealey* as suggesting that an independent contractor could be taxed for receipts from the intrastate transmission of a message that had originated outside the state or that was destined to be forwarded interstate by another carrier. Rather, *Ealey* seems to be saying that even if a person does not actually transmit a message, a fee received by that person for performance of a service is a "receipt from transmitting messages" if the person is an agent (as opposed to an independent contractor) of the company transmitting the message and the service performed is "vital" to the transmission. Our reading of *Ealey* is reinforced by the court's quotation with approval from the opinion of Judge Hernandez in the court of appeals. Judge Hernandez, finding the tax on Mrs. Ealey to be barred by the above-quoted statutory provision, wrote:

"Once a telegram is transmitted bound for an interstate destination it becomes part of the national network of telegraphic communications. Each separate mode of relay or transmission cannot be isolated and taxed as a local incident."

*Id.* (quoting *Ealey v. Bureau of Revenue,* 89 N.M. 174, 176, 548 P.2d 454, 456 (Ct. App.1975)). This language certainly implies that Mrs. Ealey's transmission between Farmington and Albuquerque of in-

terstate messages would not be taxable even if she had been an independent contractor.

Second, the Department adopts the hearing officer's view that *Ealey* can be distinguished because "the backdrop for the *Ealey* decision was a now outdated concept of states' ability to tax activities in the stream of interstate commerce." We agree that in the years since *Ealey* was decided, there have been significant changes in United States Supreme Court doctrine regarding taxation of activities associated with interstate commerce. *See, e.g., Goldberg v. Sweet*, 488 U.S. 252, 109 S.Ct. 582, 102 L.Ed.2d 607 (1989). In our view, however, the changes do not undercut the applicability of *Ealey* to this case. On the contrary, an appreciation of United States Supreme Court doctrine at the time that Section 7–9–55 was originally enacted, and at the time that *Ealey* was decided, reinforces our interpretation of Section 7–9–55 and *Ealey*.

The original version of Section 7–9–55, as enacted by 1969 N.M. Laws, Chapter 144, Section 45, and as it still read at the time of *Ealey*, stated:

> Receipts from transactions in interstate commerce may be deducted from gross receipts to the extent that the imposition of the gross receipts tax would be unlawful under the United States Constitution.
>
> Receipts from transmitting messages or conversations by telegraph, telephone or radio other than from one point in this state to another point in this state may be deducted from gross receipts.

The Department's argument would be persuasive if *Ealey* had relied on the first paragraph of the section to hold that Mrs. Ealey's compensation *for* sending interstate messages was not subject to the state gross receipts tax. If *Ealey* had rested on the determination that the Commerce Clause of the United States Constitution barred the tax on Mrs. Ealey, then the decision would lose its force when the United States Supreme Court substantially changed its Commerce Clause doctrine. As we understand *Ealey*, however, it relies on the second paragraph of the section. Al-

though the *Ealey* opinion refers to cases deciding constitutional issues, the citations are used to support the court's interpretation of the second paragraph. When the *Ealey* court wrote that "[t]he language of [Section 7–9–55] appears to us to be clear and unambiguous and is applicable to the appellant insofar as she transmits interstate messages," *id.* 89 N.M. at 161, 548 P.2d at 455, the "clear and unambiguous" language referred to could hardly have been the general statement in the first paragraph that receipts may be deducted when the constitution so requires. The "clear and unambiguous" language was in the second paragraph of the statute.

Moreover, to the extent that *Ealey* was influenced by former constitutional doctrine in its interpretation of the second paragraph of Section 7–9–55, such reliance on former doctrine would still be appropriate today. Interpreting the language of a statute often requires an understanding of the context in which the statute was enacted. An important part of that context is the surrounding body of law. When writing a statute regarding taxation of activity connected with interstate commerce, the constitutional limitations on such taxation may be of critical importance. Those who enacted Section 7–9–55 were undoubtedly aware of the possibility of such limitations; after all, the first paragraph of the section expressly refers to such limitations and prohibits taxation that would violate the limitations.

In light of the first paragraph, one can presume that the second paragraph was intended to conform to the legislature's understanding of constitutional limitations. If the legislature, thinking that there might be a future change in the United States Supreme Court's interpretation of the Commerce Clause, intended to enact a law that would permit taxation of telephone transmissions that was probably barred by constitutional doctrine at the time of the enactment, then it would have made more sense for the enactment to omit the second paragraph and rely simply on the first paragraph. Under the first paragraph, the tax could be imposed to the full extent permitted by the Constitution, with the imposition

of the tax expanding as new Supreme Court constitutional doctrine permitted the expansion.

What, then, was the likely understanding by the legislature of the constitutional restrictions on taxation of receipts from transmitting messages and conversations? *Ealey* strongly suggests that under Commerce Clause doctrine of the time, a tax on an intrastate component of the transmission of an interstate message would be unconstitutional. Of particular importance in this regard was the United States Supreme Court decision in *Western Union Telegraph Co. v. Foster*, 247 U.S. 105, 38 S.Ct. 438, 62 L.Ed. 1006 (1918). *Ealey* summarized the case as follows:

> [T]he New York Stock Exchange agreed to furnish to certain telegraph companies quotations of prices made in transactions upon the Exchange. The quotations, which were furnished in New York, were then telegraphed to Boston where they were translated from Morse code into English, and then transmitted by an operator to the tickers in the offices of those brokers who had subscribed to the service and had been approved by the Exchange. Foster applied for such service to the various telegraph companies involved, but his application was disapproved by the Exchange. As a result, the Public Service Commission of Massachusetts issued an order declaring the refusal by the telegraph companies to supply to Foster the ticker service an unlawful discrimination. The order required the telegraph companies to remove the discrimination and supply Foster with the service. Mr. Justice Holmes, writing for the U.S. Supreme Court, reasoned that *the quotations were interstate commerce when they were transmitted from New York to Massachusetts, and remained interstate commerce until they reached "the point where the parties originally intended that the movement should finally end."* Since the quotations were interstate commerce, the order by the Public Service Commission was an unconstitutional interference by a state, and was therefore void.

89 N.M. at 162, 548 P.2d at 442 (emphasis added). If the state could not regulate the intrastate component of the telegraph transmission, presumably it also could not tax that component. *See Cooney v. Mountain States Tel. & Tel. Co.*, 294 U.S. 384, 55 S.Ct. 477, 79 L.Ed. 934 (1935) (license tax on telephones violated prohibition against tax on interstate commerce). We may assume that the 1969 legislature, when it enacted the original version of Section 7–9–55, had the same view of constitutional limitations as did the *Ealey* court in 1976. *Cf. Quintana v. New Mexico Dep't of Corrections*, 100 N.M. 224, 668 P.2d 1101 (1983) (legislature presumed to be informed as to existing law). Thus, when we interpret the language of the second paragraph of Section 7–9–55 in light of the legal environment in which it was written, it seems most reasonable to interpret the language as prohibiting imposition of a tax on any component of the transmission of an interstate message. In other words, it is very likely that legislative intent was that the words "other than from one point in this state to another point in this state" modify "messages or conversations," which is the holding of *Ealey*.

Furthermore, even if *Ealey* were incorrect in its understanding of the pertinent constitutional doctrine, what *Ealey* did was interpret a statute. As an inferior court, we are bound by our supreme court's interpretation of statutory language. *See Alexander v. Delgado*, 84 N.M. 717, 507 P.2d 778 (1973).

Another argument by the Department is that access charges are not deductible from gross receipts under Section 7–9–55 because access charges are not "receipts from transmitting messages or conversations." As we understand the Department, it is contending that the access charge is simply a charge for opening the switch so that the interstate (interLATA) carrier has access to the local facilities of an intraLATA carrier such as GTE. We disagree with this characterization of the access charge. As the Department acknowledges, *Leaco Rural Tel. Coop., Inc. v. Bureau of Revenue*, 86 N.M. 629, 526 P.2d 426 (Ct.

App.1974), held that telephone companies sell services rather than tangible personal property. The service paid for by the access charge is virtually identical to the service that GTE supplies to its local customers. Instead of routing a call from one customer in Hobbs to another customer in Hobbs, the access charge pays for routing a call between a Hobbs customer and, say, the Hobbs switching center for AT & T. Our view of the identity of the two services is supported by 47 C.F.R. Section 69.106 (1990), which states:

**Local switching.**

(a) Charges that are expressed in dollars and cents per access minute of use shall be assessed upon all interexchange carriers that use local exchange switching facilities for the provision of interstate or foreign services.

(b) A per minute charge shall be computed by dividing the projected annual revenue requirement for the Local Switching element by the projected annual access minutes of use for all interstate or foreign services that use local exchange switching facilities.

(c) If end users of an interstate or foreign service that uses local switching facilities pay message unit charges for such calls in a particular exchange, a credit shall be deducted from the Local Switching element charges to such carrier for access service in such exchange. The per minute credit for each such exchange shall be multiplied by the monthly access minutes for such service to compute the monthly credit to such a carrier.

(d) If all local exchange subscribers in such exchange pay message unit charges, the per minute credit described in paragraph (c) of this section shall be computed by dividing total message unit charges to all subscribers in a particular exchange in a representative month by the total minutes of use that were measured for purposes of computing message unit charges in such month.

(e) If some local exchange subscribers pay message unit charges and some do not, a per minute credit described in paragraph (c) of this section shall be computed by multiplying a credit computed pursuant to paragraph (d) of this section by a factor that is equal to total minutes measured in such month for purposes of computing message unit charges divided by the total local exchange minutes in such month.

Under subsection (c) if, say, a GTE customer pays for telephone service not by means of a flat monthly rate but on a per-call (message unit) basis, then the interstate carrier receives a credit on its access charge from GTE for the message unit charge from GTE to the local customer on an interstate call. Implicit in the granting of this credit is a recognition that the message unit charge for an interstate call pays for the same service that is paid for by the access charge; the credit is necessary to prevent double payment to GTE. In short, the access charge is for the service of transmitting the telephone signal between the interLATA carrier's switching center and the local phone customer. Receipts from such charges are "receipts from transmitting messages."

Finally, the Department argues that its interpretation of Section 7–9–55 is compelled by the amendment to the gross receipts tax statute that took effect on July 1, 1986. The amendment deleted the references to telegraph and telephone communications in Section 7–9–55 and added the following Section 7–9–56(C):

Receipts from providing telephone or telegraph services in this state which will be used by other persons in providing telephone or telegraph services to the final user and thirty-five percent of the receipts of persons providing interstate and foreign telephone or telegraph services from transmitting interstate messages or conversations may be deducted from gross receipts.

The Department, pointing out that this section clearly deducts access charges from gross receipts, argues that prior law must have included such charges as gross receipts because "when [the legislature] enacts a new statute, it is presumed that it intended to change the law which previously existed. *State ex rel. Bird v. Apodaca,*

91 N.M. 279, 573 P.2d 213 (1977)." We disagree for three reasons.

First, although the proposition stated by the Department may be useful in interpreting the meaning of a new statute, it is not a proper canon for construing the earlier statute. We fail to see how legislative action in 1986 is appropriate legislative history for the interpretation of a 1969 law. *See Sullivan v. Finkelstein,* 496 U.S. 617, 626, 110 S.Ct. 2658, 2667, 110 L.Ed.2d 563, 577 (1990) (Scalia, J., concurring in part).

Second, even under our interpretation of the former Section 7–9–55, the amendments changed the law. The new statute imposes for the first time a gross receipts tax on 65% of the receipts from transmitting interstate telephone conversations. Although the first portion of the sentence in Section 7–9–56(C) continues non-taxation of access charge receipts, that language may well have been included by the legislature to avoid any confusion as to whether access charges are considered to be receipts described in the second portion of the sentence.

Third, even if the legislature had enacted only that portion of Section 7–9–56(C) that exempts access charges from gross receipts tax, we would not infer that the legislature believed that prior law permitted taxation of such charges. In light of the breakup of AT & T, the legislature may have thought it useful to clarify a matter that could have been the subject of contention under the prior statutory language. Indeed, the Department's brief states, "It is reasonable to assume that the legislature knew that the Department was taxing access charges." The legislature may well have decided to make it crystal clear that such a tax should not be imposed, even if it thought that a reasonable construction of the prior statute would produce the same result. If we always presumed that a legislative amendment changed prior law, we would discourage legislative efforts to clarify prior law. There is no reason to presume that the legislature agreed that the earlier statutory language provided for taxation of access charges.

In sum, we hold that taxation of the access charge receipts was barred by Section 7–9–55. Because our decision rests on construction of a New Mexico statute, we are not persuaded by decisions interpreting statutes of other states which contain different language. *Compare AT & T Communications v. Department of Revenue,* 778 P.2d 677 (Colo.1989) (en banc) (permitting taxation) *with GTE Sprint Communications v. Department of Treasury,* 179 Mich.App. 276, 445 N.W.2d 476 (1989) (barring taxation). GTE is entitled to a refund of the tax paid and the penalty imposed for failure to pay that tax.

## II. ANCILLARY SERVICES

■ A portion of the tax protested by GTE was gross receipts tax imposed on GTE's receipts for ancillary services performed for interstate carriers. For example, if a Hobbs customer placed a long distance call with AT & T, GTE would bill that call for AT & T, collect the charge from the GTE customer, and remit the revenue to AT & T. Although these services are certainly related to the provision of interstate telephone service, the receipts are not "[r]eceipts from transmitting messages or conversations by ... telephone." Therefore, receipts for these services were not deductible under Section 7–9–55. GTE does not present any other argument for deduction or exclusion of these receipts from taxation. We affirm the denial of GTE's protest of this tax.

## III. MUNICIPAL FRANCHISE FEE

■ Various municipalities impose charges on public utilities granted franchises by the municipalities. The charges are to cover the reasonable expenses incurred in the granting and exercise of the franchise. *See* AG Op. No. 78–3 (1978) (Alarid, Ass't A.G.). GTE pays such fees to various municipalities and then passes on the cost to customers in the respective municipalities. The fee is shown as a separate line item on the telephone bill, which sets out the charge and identifies it as a municipal franchise fee. The tariff governing GTE's rates requires GTE to pass through

to its customers their proportionate share of any municipal franchise fee.

NMSA 1978, Section 7–9–3(F) (Repl.Pamp.1983) says " 'gross receipts' means the total amount of money or the value of other consideration received from ... performing services in New Mexico." The Department has included the pass-throughs of franchise fees in GTE's gross receipts. GTE contends that it is being improperly taxed because it does not receive the pass-throughs for performing a service. We disagree.

In some circumstances a pass-through is not a gross receipt. "Where the tax is imposed on the buyer and the seller merely acts as the collector of the tax, the amounts collected by the seller can be excluded from the gross receipts[.]" *United Nuclear Corp. v. Revenue Div.*, 98 N.M. 296, 301, 648 P.2d 335, 340 (Ct.App.1982). That, however, is not the case here. The municipal franchise fee is imposed on GTE, not on customers of GTE. It is a cost of doing business, just as rent and wages are. The tariff governing what GTE charges its customers does not change the incidence of the tax. Surely if the tariff required a separate line item for the customer's share of expenses for, say, pollution abatement equipment, the customer's payment for that amount would be included in gross receipts. The line item on the customer's bill for a share of the municipal franchise fee is part of the charge to the customer for receiving telephone services, and payment of that amount by the customer is a gross receipt by GTE for provision of telephone services.

The situation here is essentially the same as in *Agron v. Illinois Bell Telephone Co.*, 449 F.2d 906 (7th Cir.1971), *cert. denied*, 405 U.S. 954, 92 S.Ct. 1171, 31 L.Ed.2d 231 (1972). The company was assessed a federal excise tax computed on " 'amounts paid for ... communication services.' " *Id.* at 907 (quoting Section 4251 of the Internal Revenue Code of 1954). The court held that occupation taxes imposed on the company by the state and some municipalities were includable in the excise tax base, even though the local tax was shown separately on the customer's telephone bill.

Also on point is our holding in *United Nuclear Corp.* The taxpayer in that case mined uranium concentrate and shipped it to buyers. A severance tax was imposed on the taxable value of uranium ore. The statute provided that " 'the taxable value means the total amount of money and the reasonable value of other consideration received, or either of them, for the severed and saved uranium ore or processed uranium 'yellowcake' concentrate.' " 98 N.M. at 299–300, 648 P.2d at 338–39. Contracts between taxpayer and its buyers provided that the buyers were to pay the applicable severance tax. Bills to the customers stated the price of the uranium concentrate separately from the severance tax. Nevertheless, we held that the severance tax should be imposed on the full amount taxpayer received from its buyers. The taxpayer was not acting as collector of the tax from the buyer; the legal incidence of the severance tax fell on the taxpayer itself.

We are not persuaded by the one case cited by GTE in support of its position: *Getto v. City of Chicago*, 77 Ill.2d 346, 33 Ill.Dec. 155, 396 N.E.2d 544 (1979), *cert. denied*, 456 U.S. 946, 102 S.Ct. 2012, 72 L.Ed.2d 468 (1982). That decision turned on statutory language not present here.

We hold that the total amount of money received by GTE for selling its telephone services includes the amount identified on its bills as the customer's share of a municipal franchise fee. We therefore affirm the denial of GTE's protest of this tax.

## IV. CONCLUSION

For the above reasons, we affirm the denial of GTE's protests of gross receipts taxes imposed on ancillary service fees and pass-throughs of municipal franchise fees, and we reverse the denial of GTE's protest of gross receipts taxes imposed on access charges and the accompanying penalty. No costs are awarded.

BIVINS and APODACA, JJ., concur.

APPENDIX

BEFORE THE SECRETARY OF THE TAXATION AND REVENUE DEPARTMENT OF THE STATE OF NEW MEXICO

IN THE MATTER OF GTE SOUTHWEST, INC.,

New Mexico I.D. No. 01–004802–00 2,

Protest to Assessment No. 1029614.

## DECISION AND ORDER

This matter came on for hearing before Gerald B. Richardson, Hearing Officer on February 21, 1990. GTE Southwest, Inc., hereinafter "Taxpayer" or "GTE," was represented by J.W. Neal, Esq., and by William H. Ballard, Esq. The Taxation and Revenue Department, hereinafter "Department," was represented by Carolyn A. Wolf, Esq. At the close of the hearing, it was agreed by the parties that the matter would be continued to allow for the filing of briefs and reply briefs by the parties. Final briefing was completed upon the receipt of GTE's reply brief on May 4, 1990 and the matter was considered submitted for decision at that time. Based upon the evidence and the arguments presented, IT IS DECIDED AND ORDERED that:

1. This matter arose as a result of an audit of GTE by the Department which occurred in 1987. Based upon the audit, the Department issued Assessment No. 1029614 for the reporting periods January 1, 1984 through December 31, 1986. The assessment was for gross receipts tax in the amount of $1,851,378.78, compensating tax in the amount of $23,541.08, penalty in the amount of $187,492 and interest in the amount of $791,074.70, for a total of $2,853,486.56. The assessment was dated April 18, 1988 but was mailed to the taxpayer for purposes of computing the time for filing the protest of the assessment, pursuant to Section 7–1–24(B) NMSA 1978 on May 9, 1988.

2. On June 6, 1988, the Taxpayer timely protested the assessment of taxes pursuant to Section 7–1–24 NMSA 1978. At the same time, the Taxpayer transmitted a check in the amount of $1,874,919.86, constituting the tax principle portion of the assessment, in order to prevent the accrual of further interest and penalty upon the assessment, pending resolution of the Taxpayer's protest.

3. At the time the assessment was issued, there were approximately ten areas of dispute between the parties concerning the taxes assessed. By the time of the hearing, however, many areas of dispute had been resolved between the Department and GTE. The Department agreed to abate all tax, penalty and interest arising from several audit issues and GTE conceded that it owed tax and interest on several other issues, while continuing to dispute all penalty assessed. GTE brief, pp. 2–3. *See*, also, Department's Exhibit 1.

4. There remain four areas of dispute between the Department and GTE. They are as follows:

A. taxation of access charges, $969,311.03 in tax principle;

B. taxation of municipal franchise fees, $10,294.93 in tax principle;

C. taxation of ancillary services, $31,568.65 in tax principle; and

D. penalty in the amount of $114,446.53.

These four areas of dispute will be discussed separately.

5. The issue with regard to access charges is whether the revenues which GTE receives from telephone access charges or switched access revenue are subject to New Mexico's gross receipts tax. In order to answer this question, a discussion of the historical and statutory background concerning this issue is necessary. It is significant that the commencement date for the Department's assessment is January 1, 1984. This date coincides with the effective date of the breakup of the Bell System under the terms of the modified final judgment in *United States v. American Tel. and Tel. Co.*, 552 F.Supp. 131 (D.D.C.1982), *aff'd sub nom. Maryland v. United States*, 460 U.S. [1001] 101 [103 S.Ct. 1240, 75 L.Ed.2d 472] (1983), the U.S. Justice Department's antitrust suit brought against AT & T. The divestiture

suit forced AT & T to divest itself of its local operating companies, such as Mountain Bell. The access charge revenues at issue here were a product or result of the divestiture litigation. Prior to that time, GTE received its interstate toll revenues for long-distance calls placed with it in New Mexico through a division of revenue process of separations and settlements wherein all telephone companies in New Mexico, including GTE, pooled their interstate toll revenues and then were compensated from that pool based upon their individual investment, expenses and taxes associated with providing interstate toll service. After divestiture, an entirely new system was implemented. The United States was divided into geographical regions called LATAs. LATA stands for local access transport area. Most states were divided into multiple LATAs because of their size and population characteristics. However, the entire state of New Mexico constitutes one LATA. Companies providing telephone services were divided into two categories—those that provide only inter-exchange services (telephone services between LATAs, called inter-exchange carriers) and those that provide only local telephone services, referred to as local operating companies. Inter-exchange carriers can generally be conceived of as providing long-distance telephone services, although these services do not necessarily mean that the calls carried by the inter-exchange carriers are interstate calls because some calls may simply be calls carried between one LATA and another LATA within the same state. Examples of inter-exchange carriers are AT & T, Sprint and MCI. GTE is a local exchange company, which provides local telephone service in a given geographic location. U.S. West is an example of another local exchange company operating within New Mexico. For a description of LATAs, see *U.S. v. Western Electric Company*, 569 F.Supp. 990 (1983).

Under the new system, post-divestiture, each long-distance call is comprised of three parts. The originating call begins when a telephone subscriber, customer or end user initiates a long-distance call, using his local operating company's network. The call is then transmitted to a switch where the call is connected to the long-distance carrier's network. The part of the call that is carried on the long-distance carrier's network is called the intermediate link. The call then leaves the long-distance carrier's network at an exit point in the area where the call is to be received. There it is switched back to a local operating company's network, which transmits the call to the end user. See *GTE Sprint Communications v. Michigan Department of Treasury*, [179 Mich.App. 276] 445 N.W.2d 476 (1989) and *AT & T Communications v. Colorado*, 778 P.2d 677 (Colo. 1989), for descriptions of this system.

Since divestiture, AT & T and other long-distance or inter-exchange carriers have had to pay the local exchange companies, such as GTE, for access services. 47 C.F.R. Section 69.2(b) defines "access service" as "services and facilities provided for the origination or termination of any interstate or foreign telecommunication." Thus, access charges are the tariffs which interexchange carriers must pay to the local operating companies for access to the local operating companies' exchange network. The issue presented herein is whether GTE's revenues from providing access services are subject to gross receipts tax in New Mexico during the assessment period at issue.

6. The statutory provisions in the New Mexico tax statutes must also be reviewed with respect to the taxability of the access charges at issue. At the time the audit was commenced, January 1, 1984, the only statutory provision which specifically addressed telephone services with respect to gross receipts tax was Section 7–9–55. It provided in part:

Receipts from transmitting messages or conversations by telegraph, telephone or radio other than from one point in this state to another point in this state ... may be deducted from gross receipts.

Gross receipts was defined at Section 7–9–3(F) in pertinent part as:

"Gross receipts" means the total amount of money or the value of other considera-

tion received from selling property in New Mexico, from leasing property employed in New Mexico or from performing services in New Mexico, ...

There can be little doubt that GTE is rendering services in New Mexico when it provides telephone service to its customers. *Leaco Rural Telephone Co-op, Inc. v. Bureau of Revenue*, 86 N.M. 629, 526 P.2d 426 (Ct.App.1974). Thus, at the commencement of the audit period, GTE was subject to gross receipts tax on its rendition of telephone services, with the exception of the deduction provided by Section 7–9–55 for its receipts from transmitting interstate telephone messages. In 1986, the legislature amended Section 7–9–55 to delete the words "telegraph and telephone," leaving only receipts from transmitting interstate radio messages subject to the deduction found therein. At the same time, Section 7–9–3(F) was amended to include in the definition of gross receipts,

> amounts received from transmitting messages or conversations by persons providing telephone or telegraph services, including interstate and international messages or conversations that either originate or terminate in New Mexico and are billed to a New Mexico telephone number or account.

Additionally, Section 7–9–56 was amended to include a new paragraph (C) which provides:

> Receipts from providing telephone or telegraph services in this state which will be used by other persons in providing telephone or telegraph services to the final user and 35% of the receipts of persons providing interstate and foreign telephone or telegraph services from transmitting interstate messages or conversations may be deducted from gross receipts.

These changes were enacted by Laws 1986, Ch. 52 Sections 1–3, effective July 1, 1986. The effect of these amendments is to specifically include in the definition of gross receipts amounts received from transmitting interstate and international messages which either originate or terminate in New Mexico and are billed to a New Mexico telephone number or account, and then to provide a specific deduction in Section 7–9–56(C) for receipts from providing access services ("telephone services which will be used by other persons in providing telephone services to the final user"), and to provide a deduction for 35% of a telephone company's receipts from transmitting interstate messages or conversations. Since the 1986 amendment specifically provided a deduction at Section 7–9–56(C) for telephone access services, the issue of taxability is only relevant for purposes of this assessment for the period of January 1, 1984 to June 30, 1986.

7. With this background, the issue presented is whether GTE's access charge receipts constitute "receipts from transmitting messages or conversations by ... telephone ... other than from one point in the state to another point in the state ..." so as to be deductible pursuant to Section 7–9–55 NMSA 1978. Prior to January 1, 1984, the Department did not attempt to impose its gross receipts tax upon GTE's receipts which it received under the revenue pooling agreements from transmitting interstate telephone messages. GTE's contention, in a nutshell, is that, although after January 1, 1984 it no longer received interstate toll revenues by way of the pooled revenue settlement process, the access charge revenues it began receiving in January 1, 1984 were merely a substitution for the previous pooled revenues, and that they constitute receipts from transmitting interstate phone messages which are deductible under Section 7–9–55. In support of its position, the taxpayer produced evidence that the process for handling interstate calls did not change after divestiture. The switching process and the transmission path for the telephone calls remained essentially the same, both pre- and post-divestiture. GTE contends that both pre- and post-divestiture, in order for an interstate call to be transmitted, there needed to be access into GTE's local network. It is GTE's contention that access to the local network is an integral process to the transmission of interstate telephone calls, and that therefore, its access charge receipts

are not separable for tax purposes, but rather, constitute receipts from transmitting interstate telephone messages, subject to the deduction at Section 7–9–55. With regard to this question, it is noteworthy that since New Mexico constitutes a single LATA, all access charges GTE received for transmittal of messages into its local network relate strictly to the transmission of interstate phone messages.

8. The Department contends that GTE's receipts for providing access services are not receipts from transmitting interstate messages. Rather, it is payment for access to GTE's switching and transmission capabilities. It thus believes these access services are identifiable as a separate element of an interstate telephone call and are separately taxable.

9. Given the positions of the parties, the resolution of this matter turns on the proper characterization of the revenue stream at issue.

10. Support for GTE's position may be found in *U.S. v. AT & T,* 552 F.Supp. 131 (1982) and *U.S. v. Western Electric Co., Inc.,* 569 F.Supp. 990 (D.D.C.1983), where language may be found suggesting that the access tariffs are a substitute for the funds received for the local operating companies under the division of revenue process which allocated interstate toll revenues between operating companies and AT & T's long lines division. These cases are both cases dealing with the divestiture of the Bell System and did not address any possible tax consequences attributable to the creation of access charges, a new and identifiable element of interstate telecommunications. In fact, the discussion of access charges vs. the former pooling of revenues procedure occurred in the context of a discussion about whether long-distance revenues had subsidized the provision of local telephone services. This issue was never determined because of the consent decree entered into between the Justice Department and AT & T.

11. Further support for GTE's position may be found in *Ealey v. Bureau of Revenue,* 89 N.M. 160, 548 P.2d 440 (1976).

Ealey was an agent of Western Union who transmitted and received messages in Farmington and was paid by Western Union 70 cents per message either sent or received. The Bureau of Revenue had assessed gross receipts tax on the amount paid to Ealey by Western Union. Ealey transmitted the messages from Farmington to Albuquerque where they were then switched into an interstate network for transmission. The Bureau of Revenue had contended that Ealey's receipts were receipts from the transmission of the message to or from Albuquerque which therefore did not constitute receipts, deductible under Section 7–9–55, from transmitting interstate messages. The New Mexico Supreme Court reversed the Bureau of Revenue as to messages which were ultimately transmitted out of state, ruling that "once a telegram is transmitted down for an interstate destination, it becomes part of the national network of telegraphic communications. Each separate mode of relay or transmission cannot be isolated and taxed as a local incident." 89 N.M. 160, 161, 548 P.2d 440.

12. There is also support for the Department's position. The precise issue of whether access services are an integral part of an interstate call and are not separable for tax purposes was decided in *AT & T Communications v. Department of Revenue,* 778 P.2d 677 (Colo.1989). In that case, the Colorado Supreme Court thoroughly reviewed the effects of divestiture on long-distance service and analyzed the nature of access charges. It concluded that "access services clearly have identifiable physical characteristics which affect the interstate transmission portion of the telephone call and may be separated from that portion of the call." 778 P.2d 677, 684. In arriving at this conclusion, the court reviewed the effects of divestiture on interstate telecommunications. It noted that after divestiture, purchase and sale of access services are arm's-length transactions between two separate companies, the long-distance carrier and the local operating company. Although both are engaged in providing telephone services which are complimentary, their services are mutually

exclusive. 778 P.2d 677, 683. The court also relied upon *Kahn and Shew*, "Current Issues in Telecommunications Regulation: Pricing," 4 Yale Journal on Regulation, 191 (1987). In this article, the authors argue that access is a service for which subscribers should pay separately from other usages of the system.

13. Further support for the Department's position that access services are separable (and therefore separately taxable) from interstate telephone call revenues can be found in two Michigan tax cases. At issue was whether the purchase of local exchange services (access charges) by interstate telephone carriers (MCI and GTE Sprint) from a local exchange (Michigan Bell) was subject to Michigan's use tax. In the first case, *MCI Telecommunications v. Department of Treasury* [136 Mich.App. 28], 355 N.W.2d 627 (1984), MCI argued that as an interstate carrier, when it purchases access to the Michigan Bell System, it is merely purchasing an integral part of the interstate communication service which it provides to its customers, and its use of the access services should not be separately taxable. The court rejected this argument, ruling that the local exchange services purchased by MCI are separable and separately taxable as an intrastate activity.

In the second case, *GTE Sprint Communications v. Department of Treasury* [179 Mich.App. 276], 445 N.W.2d 476, the court ruled on an issue not raised in the *MCI* case, whether the activity taxed actually fell within the language of Michigan's use tax statute. In ruling that MCI was not subject to use tax on its use of access services provided by Michigan Bell, the court construed the language of the use tax statute to determine that the Michigan legislature had only intended to tax a complete telephone communication (from origination point to destination point). Since access services were not a complete communication but only part of a communication, their use was not subject to tax. Although this case does not directly apply to a determination of GTE's claim of deduc-

tion under New Mexico's statutes, nonetheless, it supports the Department's view that access service charges are separable and distinct from interstate call revenues.

14. Resolution of this question is a matter of first impression in New Mexico. Ultimately, it turns on whether the revenues are characterized as receipts from transmitting interstate messages or whether they are receipts to compensate GTE for access to its local telephone network. This is a difficult question, but ultimately, the hearing officer believes that the reasoning of the Colorado Supreme Court in *AT & T Communications v. Department of Revenue, supra,* and the two Michigan cases discussed above, which treat access charges as separable from interstate call revenues, reflects the better reasoned view. Although divestiture did not change the actual manner in which long-distance telephone calls were made, it did identify, for the first time, separate components of interstate telephone call transmission and required telephone companies to file tariffs for the provision of access services "on an unbundled basis specifying each type of service, element by element." *See,* modified final judgment (divestiture case), *U.S. v. AT & T,* 552 F.Supp. 131 at 233.

15. In order to arrive at this conclusion, *Ealey v. Bureau of Revenue, supra,* must be discussed. The hearing officer believes that the conclusion of the New Mexico Supreme Court in the *Ealey* case, that the transmission of a telegram bound for an interstate destination becomes inseparable from the interstate transmission of the telegraph message, no longer reflects the modern realty [sic] of interstate telecommunications or the modern view concerning taxation of messages in interstate commerce. It is noteworthy that Mrs. Ealey was an agent of Western Union, the company which carried the interstate telegraph messages from origination point to destination. There was no separate business entity, as there is now, post-divestiture, which transmits a message into another business entity's transmission network for relay. Since the telegram was transmitted entirely on Western Union's network, it is easy to see how the court in *Ealey* regarded the

transmission of the telegraph messages to be a single and indivisible transmission which was interstate in character. It must also be remembered that the backdrop for the *Ealey* decision was a now outdated concept of states' ability to tax activities in the stream of interstate commerce. The deduction which the court allowed Mrs. Ealey to take, which is identical to Section 7–9–55 before it was amended by Laws 1986, Section 52, contains the identical first paragraph which generally taxed all transactions in interstate commerce except where prohibited by the United States Constitution. *See*, Section 72–16A–14.10 NMSA 1953. *Ealey* was decided in 1976, before the U.S. Supreme Court's seminal decision in *Complete Auto Transit v. Brady*, 430 U.S. 274 [97 S.Ct. 1076, 51 L.Ed.2d 326] (1977), rejected the theory that states cannot impose a tax on the privilege of engaging in an activity within the stream of interstate commerce. Modern Commerce Clause analysis now permits state taxation of interstate telephone calls so long as the tax meets the four-part *Complete Auto Transit* test. *See*, *Goldberg v. Sweet*, 488 U.S. 252, 109 S.Ct. 582, 102 L.Ed.2d 607 (1989), discussed in paragraph 17, *infra.* Thus, the factual and the legal underpinnings of the *Ealey* decision can be distinguished in the instant case.

16. The most persuasive evidence, however, that access charges were subject to gross receipts taxation commencing with the Bell System divestiture and the commencement point of the Department's assessment can be found in the statutory modifications which occurred in 1986. As noted previously, in 1986, Section 7–9–56 was modified to add a new paragraph C, which provided that "receipts from providing telephone or telegraph services in this state which will be used by other persons in providing telephone or telegraph services to the final user ... may be deducted from gross receipts." Thus the legislature took specific action, effective January 1, 1986, to provide a deduction from gross receipts for telephone access services. Although GTE argues that this indicates a legislative intent that access services

should continue to be exempt, this view conflicts with two general rules of statutory construction. The first rule is that the legislature is presumed to know the law in effect, and when it enacts a new statute, it is presumed that it intended to change the law which previously existed. *State, ex rel. Bird v. Apodaca*, 91 N.M. 279, 573 P.2d 213 (1977). Secondly, there is also a presumption that in enacting laws, the legislature does not use surplus language or enact useless laws. *See* also, *State, ex rel. Bird v. Apodaca.* If access charges were already exempt from gross receipts taxation in New Mexico, there would be no need for the specific language of Section 7–9–56(C) to have been enacted to provide for a deduction from gross receipts. Thus, it must be presumed that in enacting Section 7–9–56(C), the legislature sought to provide a tax deduction where none existed before.

17. GTE has also raised the contention that the imposition of New Mexico's gross receipts tax on its access charge revenues impermissibly impacts interstate commerce and the Commerce Clause of the U.S. Constitution. In this argument, GTE relies upon *Goldberg v. Sweet, supra,* which is the U.S. Supreme Court case which upheld Illinois' taxation of interstate telecommunications which originate or terminate in the state and are charged to an Illinois service address against a Commerce Clause challenge. The Court ruled that the tax met the four-part test of *Complete Auto Transit* in that the tax was applied to an activity with a substantial nexus with the taxing state, was fairly apportioned, did not discriminate against interstate commerce, and was fairly related to the services provided by the state. GTE contends that New Mexico's tax on access charges fails to comply with the second prong of the *Complete Auto Transit* test, fair apportionment, because New Mexico's tax on access charges does not have a credit provision, like the Illinois excise tax upheld in *Goldberg*, which allowed a credit if the taxpayer could demonstrate that another state had taxed the same call. This issue is a red herring. The *Complete Auto Transit* test is only applied to taxes imposed upon activities in interstate commerce.

There is no need for such a credit provision with respect to access charges because the access services being provided are for access into GTE's local network within New Mexico. All of the switching equipment and the network itself is located within New Mexico, and there is no basis for another state to have nexus to impose a tax upon charges imposed for access to GTE's New Mexico-located network. It is simply not a transaction in interstate commerce.

18. The final argument GTE raises with respect to the access charges is that somehow the Department has deprived GTE of its right to due process and equal protection in that it failed to notify GTE, by ruling, public announcement or other means, prior to its audit of GTE that it considered GTE's receipts from providing access services to be subject to gross receipts tax commencing with the divestiture of the AT & T system on January 1, 1984. GTE has cited no authority for its contention that the Department is under such a duty. Although it is true that the Department did nothing to officially inform the telecommunications industry that it intended to tax the newly identified category of revenue known as access charges, it is also true that GTE made no attempt to determine whether the Department regarded these revenues as a new category of revenue subject to gross receipts taxation. There is no statute or constitutional provision which requires a taxing agency to advise taxpayers of possible tax consequences when a change in the manner in which a taxpayer does business occurs. Rather, it is the taxpayer's responsibility to determine the tax consequences of its activities. *Tiffany Construction Co. v. Bureau of Revenue*, 90 N.M. 16, 558 P.2d [1155] 1115, (Ct.App.1976), *cert. denied*, 90 N.M. [255] 254, 561 P.2d 1348 (1977).

19. The next issue in dispute is whether GTE is subject to gross receipts tax upon revenues it received for providing "ancillary services." There was little discussion concerning this issue at the hearing, but as best as the hearing officer can determine, it involved the provision of services by GTE such as billing and collection for long-distance carriers, such as AT & T. The example given was where GTE has a billing and collection agreement with AT & T so that if a Hobbs customer originates a call that goes over the AT & T network, GTE would bill that call for AT & T and turn around and remit those revenues to AT & T which it collects from its customer. There is a dispute between the parties as to the proper characterization of these revenues. Apparently, GTE believes that the taxability of these revenues should turn on whether or not they are subject to the deduction for receipts from transmitting interstate telephone messages, found at Section 7–9–55 NMSA 1978. In other words, GTE contends that the taxability of these receipts turns on the tax treatment of access charges. The Department contends that billing subscribers and collecting for long-distance calls is a quantitatively different type of service than an access service, but nonetheless, it contends that the revenues from these services are subject to gross receipts tax. The fees which GTE receives for billing its subscribers, collecting and remitting to long-distance carriers charges for long-distance calls are not receipts from transmitting interstate messages subject to the deduction found at Section 7–9–55. These are receipts from providing a service to the interstate carriers. As such, they are gross receipts as defined in Section 7–9–3(F) NMSA 1978, and there are no applicable exemptions or deductions which would apply.

20. The next issue is whether GTE is subject to gross receipts tax upon the amounts it collects from its customers and remits to municipalities in New Mexico as municipal franchise fees. Section 3–42–1 NMSA 1978 authorizes municipalities to grant, by ordinance, franchises to any person, firm or corporation for the construction and operation of any public utility. Public utility franchise agreements are likened to contracts between the utility and a municipality and, pursuant to these agreements, the municipality may impose charges on the utilities for the reasonable expense incurred in the granting and exercise of the franchise. *See*, 1978 Op.Att'y

Gen. No. 78–3. The receipts at issue are the reimbursements which GTE seeks from its customers to reimburse it for the municipal franchise fees which it must pay to the various municipalities. They are stated as a separate line item on each GTE customer's bill. GTE's theory is that this is simply a reimbursement and does not constitute a gross receipt subject to New Mexico gross receipts tax.

21. Section 7–9–3(F) NMSA 1978 defines gross receipts to mean "the *total amount of money* or the value of other consideration received from selling property in New Mexico, from leasing property employed in New Mexico or from performing services in New Mexico ..." (Emphasis added.) The franchise fee reimbursements at issue are imposed upon GTE by the municipalities in which it operates for the exclusive right to provide local telephone service. It is not a fee that the municipality charges GTE's customers, but rather, it is the fee imposed directly on GTE itself. As such, it is a cost of doing business for GTE. Under the New Mexico general exchange tariff for GTE Southwest, GTE is allowed to, and in fact required to, pass through to its customers their proportionate share of any municipal franchise fee. *See,* Taxpayer Exhibit 2. There are no deductions or exclusions from the definition of gross receipts or from gross receipts tax for the municipal franchise fee reimbursements which GTE receives. As such, they are part of the "total amount of money" which GTE receives from its customers as part of its provisioning of telephone services to its customers in New Mexico, and is therefore a gross receipt subject to New Mexico's gross receipts tax.

22. The final issue remaining is whether the Department's assessment of penalty is proper in this case. Penalty may be assessed for the failure to pay tax when due when there is negligence or disregard of the rules and regulations of the Department. Section 7–1–69(A) NMSA 1978. Section 7–1–17(C) NMSA 1978 provides that any assessment of taxes is presumed to be correct. Section 7–1–3(S) defines tax to mean not only the total amount of each tax imposed and required to be paid, but also, "unless the context otherwise requires, includes the amount of any interest or civil penalty relating thereto." Thus, the presumption of correctness of an assessment of taxes also applies to any penalty assessed. *See also, Tiffany Construction Company v. Bureau of Revenue, supra.* GTE bears the burden to show that it was not negligent or in disregard of the Department's rules and regulations in failing to pay the taxes at issue herein. The only contested tax which GTE has made an argument upon with respect to penalty is the assessment of gross receipts tax upon access charges. Having failed to present evidence or argument to rebut the presumption of correctness as to the penalty assessed on all other taxes assessed, GTE's protest of penalty on these taxes must fail. As to penalty upon the access charges issue, GTE argues that it did not believe gross receipts tax was due upon the access charges because no tax had been collected by the division on its prior long-distance revenues and it argues that the Department should have notified it that it would be subject to tax on access charges when GTE started collecting revenues for access service charges. In *Tiffany Construction Company,* the Court of Appeals ruled that mere belief that one does not owe taxes, without further investigation, constitutes negligence. As stated by the court, "every person is charged with the reasonable duty to ascertain the possible tax consequences of his action." 90 N.M. 16, 17, 558 P.2d 1155. In this instance, GTE has presented no evidence that it sought advice from the Department concerning the taxability of access fees, nor did it make any showing that it sought legal or accounting advice or met any of the other indications of nonnegligence found in T.A. Regulation 69:4. Although there is no question that GTE is a good corporate citizen which did not intentionally attempt to avoid the taxes at issue, the penalty being imposed is not a penalty for the intentional avoidance of tax. Section 7–1–69(A) is designed specifically to penalize unintentional failure to pay tax. *El Centro Villa v. Taxation and Revenue*

*Department,* 108 N.M. 795, 779 P.2d 982 (Ct.App.1989). GTE's mere belief that it did not owe the taxes, without a showing that its belief was an informed belief based upon competent advice from tax or accounting counsel, fails to overcome the presumption that the penalty assessment is correct.

23. For the foregoing reasons, GTE's protest is hereby denied. The Department is ordered to abate the taxes, penalties and interest reflected in Department's summary of adjustments as noted in Department's Exhibit 1.

Done this ___ day of June, 1990, in Santa Fe, New Mexico.

_____
Gerald B. Richardson
Hearing Officer
Taxation and Revenue Department

_____
GAIL REESE, Secretary
Taxation and Revenue Department

CERTIFICATE OF SERVICE

I hereby certify that a true copy of this Decision and Order was served upon GTE Southwest, Inc. by mailing a copy to its attorneys, J.W. Neal, Esq., P.O. Box 278, Hobbs, NM 88241 and William H. Ballard, Esq., GTE Southwest, Inc., P.O. Box 152013, Irving, TX 75015–2013, and upon the Taxation and Revenue Department by hand-delivering a copy to its attorney, Carolyn A. Wolf, Esq., on this ___ day of June, 1990.

_____
Gerald B. Richardson