**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

Opinion Number: 2019-NMCA-074

Filing Date: September 5, 2019

No. A-1-CA-36158

MATTHEW HAYGOOD,

> Plaintiff-Appellant,

v.

UNITED SERVICES AUTOMOBILE
ASSOCIATION and HEIDI HAWKEN,

> Defendants-Appellees.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**C. Shannon Bacon, District Judge**

Released for Publication December 17, 2019.

The Law Offices of Rachel E. Higgins
Rachel E. Higgins
Mary L. Higgins
Albuquerque, NM

Wray and Girard, P.C.
Katherine A. Wray
Albuquerque, NM

for Appellant

Rodey, Dickason, Sloan, Akin & Robb, P.A.
Leslie McCarthy Apodaca
Albuquerque, NM

for Appellees

**OPINION**

**ATTREP, Judge.**

**{1}** Plaintiff Matthew Haygood appeals the district court's grant of summary judgment, dismissing his claims for breach of contract, breach of the implied covenant of good faith and fair dealing, insurance bad faith, unfair insurance practices, and unfair trade practices against insurer United Services Automobile Association (USAA) and claims examiner Heidi Hawken (collectively, Defendants). Haygood initiated the lawsuit after he was denied uninsured motorist coverage by USAA for injuries he sustained during an assault occurring in and around an uninsured motor vehicle parked outside a residence. Applying the coverage test adopted by our Supreme Court in *Britt v. Phoenix Indemnity Insurance Co.*, 1995-NMSC-075, 120 N.M. 813, 907 P.2d 994, to the stipulated facts, the district court determined Haygood's injuries had not arisen from the use of the uninsured motor vehicle. The district court therefore concluded Haygood was not entitled to coverage under the policy and dismissed all of his claims, concluding each was predicated on coverage. We conclude the district court did not err in determining Haygood was not entitled to coverage, and we accordingly affirm the district court's dismissal of the coverage-based claims. The district court, however, erred in concluding Haygood's bad faith claim depended entirely on the presence of coverage. We accordingly reverse the district court's dismissal of Haygood's bad faith claim premised on Defendants' investigation and evaluation of the claim and remand for further proceedings.

## BACKGROUND

**{2}** We draw the background from the facts stipulated by the parties in the summary judgment briefing. Late one night, Haygood was walking on the sidewalk near the house of the assailant, Kyle Cordova. As Haygood passed Cordova's house, he heard the door slam and saw Cordova running toward him, brandishing a gun. Cordova accused Haygood of breaking into his car and told Haygood he kept drugs in the car. Cordova then "pistol-whipped" Haygood in the face and pushed him into the car. Haygood resisted, but at some point in the scuffle, he was shot in the back. In recounting the course of events, Haygood recalled feeling blood on his face and laying on the ground outside the car by the time he heard the gunshot. But for purposes of summary judgment, the parties stipulated the shooting occurred while Haygood was actually inside the vehicle. There was no evidence that the car was turned on, running, or driven before, during, or after the assault.

**{3}** At the time of the assault, Cordova's car was uninsured, and Haygood sought uninsured motorist coverage from USAA, his insurer, for the injuries he sustained. The uninsured motorist portion of his policy provided that the insurer "will pay damages which a covered person is legally entitled to recover from the owner or operator of an uninsured motor vehicle" because of injury or damage sustained and/or caused by an accident. The policy further specified that "[t]he owner's or operator's liability for these damages must arise out of the ownership, maintenance or use of the uninsured motor vehicle."

**{4}** The initial claims examiner recommended coverage, concluding Haygood's injuries had likely arisen out of use of the car if the shooting occurred inside the vehicle.

After the first claims examiner retired, Hawken examined the claim. In-house counsel suggested to Hawken the determination turned on where the shooting had occurred and instructed Hawken to seek more information. Hawken and USAA continued to investigate. Eventually, without uncovering additional evidence of where exactly the shooting had occurred, USAA denied the claim, concluding Haygood's injuries had not arisen out of use of the car. Within the claim file, however, in-house counsel wrote, "I don't know that a jury would award damages to a car thief who is shot while stealing a car. If he was simply outside the car looking in and was shot, then the shooting isn't essential to the use of the vehicle. I recommend informing the attorney that we will need more information about the loss."

{5}     Haygood filed a lawsuit, alleging Defendants breached the insurance contract by failing to provide coverage, breached the implied covenant of good faith and fair dealing, engaged in insurance bad faith, violated NMSA 1978, Section 59A-16-20 (1997) of the New Mexico Unfair Insurance Claims Practices Act (UIPA), NMSA 1978, §§ 59A-16-1 to -30 (1984, as amended through 2019), and violated portions of the New Mexico Unfair Practices Act (UPA), NMSA 1978, §§ 57-12-1 to -26 (1967, as amended through 2019). Defendants moved for summary judgment, contending that, regardless of where the gunshot occurred, Haygood's injuries had not arisen out of use of the uninsured vehicle. The district court agreed, concluding that Cordova's use of the gun constituted an intervening act breaking any causal link between use of the car and Haygood's injuries and that the use of the car under the circumstances was not the kind of "normal use" required for coverage under relevant case law. The district court then concluded Haygood's claims all depended on the presence of coverage, and, as a result, dismissed each of his claims with prejudice. Haygood brought this appeal.

## DISCUSSION

{6}     Haygood contends the district court erred in imposing a normal use requirement because New Mexico's statutory provision relating to uninsured motorist insurance, NMSA 1978, § 66-5-301(A) (1983), and the related policy language, impose only a requirement of use for coverage and makes no mention of normal use. Haygood adds that even if normal use is required, the district court erred in concluding the car was not put to a normal use and Cordova's battery was an act of independent significance breaking any causal connection between use of the car and Haygood's injuries. Finally, Haygood argues the district court erred in concluding his claim of bad faith depended entirely on coverage.

## I.     Standard of Review

{7}     We review de novo the question of whether the application of law to undisputed facts supports a summary judgment determination regarding uninsured motorist coverage. *Miera v. State Farm Mut. Auto. Ins. Co.*, 2004-NMCA-059, ¶ 6, 135 N.M. 574, 92 P.3d 20. We view the facts in the light most favorable to a trial on the issues, *id.*, examining the whole record for any evidence generating a dispute as to any material fact, *Rummel v. Lexington Ins. Co.*, 1997-NMSC-041, ¶ 15, 123 N.M. 752, 945 P.2d

970. We review any questions of law de novo. *Martin v. W. Am. Ins. Co.*, 1999-NMCA-158, ¶ 11, 128 N.M. 446, 993 P.2d 763.

## II.    The *Britt* Analysis

**{8}**    *Britt* established the framework to determine whether uninsured motorist coverage extends to the victim of an intentional tort, such as Haygood. 1995-NMSC-075, ¶ 1. Examining policy language largely identical to Haygood's and the uninsured motorist statute, Section 66-5-301, *Britt* explained that both require an insurer to "indemnify the insured for damages that arise out of the use of an uninsured motor vehicle," so long as the insured is "legally entitled to recover from the owner or operator of the uninsured vehicle." 1995-NMSC-075, ¶ 9 (internal quotation marks omitted). *Britt* considered whether and when an injury might "arise out of the use of" an uninsured motor vehicle, and we thus direct our attention to this inquiry, as the parties have done. *Id.* (internal quotation marks omitted).

**{9}**    *Britt* involved a situation where one vehicle rear-ended another in a minor collision. *Id.* ¶ 2. After the collision, a passenger from the rear vehicle exited, approached the forward vehicle, and stabbed a passenger in the forward vehicle through an open window. *Id.* The attacker was never identified and the injured passenger sought uninsured motorist coverage, contending the injuries had arisen from the use of the rear, uninsured vehicle. *Id.* ¶¶ 2-3.

**{10}**    In examining that contention, *Britt* observed that other courts had "developed a method of analysis for determining whether intentional conduct and its resulting harm arises out of the use of an uninsured vehicle." *Id.* ¶ 15. *Britt* adopted that analysis, requiring consideration of the following: (1) whether a sufficient causal connection exists between the use and the harm, which "requires that the vehicle be an active accessory in causing the injury"; (2) "whether an act of independent significance [has] broke[n] the causal link"; and (3) "whether the use to which the vehicle was put was a normal use of that vehicle." *Id.* (internal quotation marks and citation omitted). Only after answering each question favorably for the insured, might a court determine that the causal connection required by statutory and policy language has been established and that coverage exists. *See id.* ¶¶ 15-17 (outlining three-part inquiry, noting "court must consider" normal use, and remanding for examination of question of whether act of independent significance had occurred). Our cases since *Britt* have not modified the *Britt* analysis. *See, e.g.*, *Crespin v. Safeco Ins. Co. of Am.*, 2018-NMCA-068, ¶¶ 1, 17, 33, 429 P.3d 968 (applying *Britt* and affirming lack of coverage for sexual assault occurring in a house some time after vehicle was used to transport the victim to the house); *Miera*, 2004-NMCA-059, ¶ 11 (applying *Britt* and its progeny to wrongful death claim arising from incident between occupants of two vehicles and remanding); *Barncastle v. Am. Nat'l Prop. & Cas. Co.*, 2000-NMCA-095, ¶¶ 2, 6, 129 N.M. 672, 11 P.3d 1234 (applying *Britt* as "controlling authority" to incident involving shooting of driver by passenger of other, uninsured vehicle); *Farmers Ins. Co. of Ariz. v. Sedillo*, 2000-NMCA-094, ¶¶ 2, 4-6, 129 N.M. 674, 11 P.3d 1236 (applying *Britt* as "controlling authority" to incident involving injuries caused by uninsured driver).

### III. *Britt* Concluded "Normal Use" Is Required

**{11}** Haygood first argues it was error for the district court to consider the "normal use" of the vehicle in its coverage determination. While Haygood acknowledges the *Britt* analysis, he nevertheless devotes substantial attention to the argument that neither our uninsured motorist statute nor the policy language at issue makes mention of normal use. But as noted, *Britt* adopted a three-part analysis to determine whether harm " 'arise[s] out of the use of an uninsured motor vehicle' " under the uninsured motorist statute and related policy language. 1995-NMSC-075, ¶ 9 (quoting § 66-5-301). Haygood ignores the fact that *Britt* directs the district court to consider normal use in this determination. *Id.* ¶ 15. Moreover, *Britt* gave no hint that its three-part analysis only applies to particular cases and gave no suggestion the use question was to be evaluated differently in certain circumstances. *See id.* ¶¶ 15-16. We thus have applied the *Britt* analysis and asked the normal use question multiple times since *Britt. See, e.g.*, *Miera*, 2004-NMCA-059, ¶¶ 11, 15; *Barncastle*, 2000-NMCA-095, ¶ 11. We remain bound by our Supreme Court's precedent and by its interpretation of the uninsured motorist statute and uninsured motorist policy language identical in relevant respects to that at issue here. *See Alexander v. Delgado*, 1973-NMSC-030, ¶ 10, 84 N.M. 717, 507 P.2d 778 (holding that the Court of Appeals is bound by Supreme Court precedent); *see also GTE Sw. Inc. v. Taxation & Revenue Dep't*, 1992-NMCA-024, ¶ 14, 113 N.M. 610, 830 P.2d 162 ("[W]e are bound by our [S]upreme [C]ourt's interpretation of statutory language."). We therefore conclude the district court did not err in examining whether the use of the vehicle here was a normal use.

### IV. The District Court Did Not Err in Determining There Was No Coverage

**{12}** Haygood next contends that the district court erred in its application of the *Britt* factors in finding no coverage. Because the *Britt* analysis requires that each of its three questions be answered in the insured's favor before coverage may be found, we focus on the use question here as its resolution is largely dispositive. *See Britt*, 1995-NMSC-075, ¶ 16 (concluding two questions may have been answered in the insured's favor but observing third was dispositive and remanding for reconsideration). For the reasons that follow, we conclude the district court did not err in determining Haygood failed to identify a normal use sufficiently causally connected to his injuries and, as such, concluding coverage was not warranted.

**{13}** Here, Haygood identified two separate uses potentially connected to his injuries and maintains both are normal uses. First, he contends his restraint against and inside the vehicle was a normal use. Second, he argues storage of belongings in a vehicle is a normal use, and Cordova's apparent storage of contraband here may have had some connection to the assault. *Britt* gave limited guidance regarding normal use. Under *Britt*, use for transportation satisfies the requirement, whereas use of a parked car as a platform for an object or weapon does not. *Id.* ¶ 15. The case *Britt* cited for this proposition—*Continental Western Insurance Co. v. Klug*, 415 N.W.2d 876, 878 (Minn. 1987)—offered an even narrower conception of the kind of use required, suggesting coverage might only arise when a car is used for "transportation purposes." *Britt*, 1995-

NMSC-075, ¶ 15; *see also Travelers Indem. Co. v. Auto World of Orangeburg, Inc.*, 511 S.E.2d 692, 699 (S.C. Ct. App. 1999) ("Significantly, neither vehicle was being used for transportation at the time of the attack[.]"). Other courts require use of a car "as a vehicle." *Travelers Ins. Co. v. LaClair*, 463 S.E.2d 461, 464 (Va. 1995). And others recognize the use requirement may encompass a broader range of uses when a vehicle has a specialized nature or function and is to be used as something more than merely a means of transportation. *See Chavez v. Ariz. Sch. Risk Retention Tr., Inc.*, 258 P.3d 145, 147 (Ariz. Ct. App. 2011) ("[W]hen a vehicle is intended to be used as more than a means of transportation, it is a specialized vehicle and its use may depend on the nature of the owner's business and the specialized nature and function of the vehicle involved." (internal quotation marks and citation omitted)).

**{14}**     Haygood devotes the bulk of his argument to his first contention that Cordova used the car to confine him (and shield him from any observers) during the assault and that this was a normal use of the vehicle. In determining whether this use meets the normal use requirement, we note, as *Britt* did, that our "uninsured motorist statute was intended to expand insurance coverage and to protect individual members of the public against the hazard of culpable uninsured motorists." *Britt*, 1995-NMSC-075, ¶ 11 (internal quotation marks and citation omitted). Nothing in the stipulated facts suggests Cordova was acting as a motorist. *See Klug*, 415 N.W.2d at 878-79 (concluding assailant used vehicle for "motoring purposes" because he "used his car not only to maneuver himself into a position to harm [victim] but also to maneuver [victim] into a position from which [victim] could be harmed"); *Huynh v. Ill. Farmers Ins. Co.*, 421 N.W.2d 390, 392 (Minn. Ct. App. 1988) (concluding parked car in which injury occurred "was not being used as a motor vehicle at the time of the accident"). The stipulated facts do not indicate the confinement here depended on or involved any transportation or other operation of the vehicle. *See Britt*, 1995-NMSC-075, ¶ 15 (observing "transportation would be a normal use"); *Barncastle*, 2000-NMCA-095, ¶ 11 (noting that the car "was put to its normal use" because "[t]he car was used to drive alongside the victim to assault him" (alteration, internal quotation marks, and citation omitted)); *see also Mason v. Celina Mut. Ins. Co.*, 423 P.2d 24, 25 (Colo. 1967) (en banc) (concluding sitting in car did not meet use requirement); *Chock v. Gov't Emp.'s Ins. Co.*, 81 P.3d 1178, 1183 (Haw. 2003) ("At the time of the shooting, the cars were not being used for transportation purposes, but rather were parked."). Nor do the stipulated facts support some specialized purpose or feature of the vehicle was involved. *See Chavez*, 258 P.3d at 147 (observing that the qualifying use of a vehicle "may depend on the nature of the owner's business and the specialized nature and function of the vehicle involved" (internal quotation marks and citation omitted)). Nothing, in short, supports an inference that the kind of injury-facilitating use at issue here, wholly in the absence of some transportation-, motoring-, or operation-related purpose, presented the kind of hazard for which our uninsured motorist statute was designed to offer protection. *See Britt*, 1995-NMSC-075, ¶ 15 (noting use of a parked car as a gun rest was not a use contemplated by the uninsured motorist statute). We thus agree with the district court that the use of the car to briefly confine Haygood during the assault was not a normal use that would trigger coverage under the insurance policy.

**{15}**     Haygood next contends that Cordova used the car to store drugs, that using a car to store belongings is clearly a normal use, and that the storage was sufficiently connected to his injuries to satisfy *Britt*'s use requirement. Given the stipulated facts, we have the same concerns about this use as we did with the first—i.e., nothing suggests this use involved or depended on transportation, operation, or a specialized feature of the vehicle, and nothing suggests Cordova was acting as a motorist. We recognize, nonetheless, that motorists frequently store belongings in vehicles, and we recognize that storage, under certain circumstances, may present a qualifying use sufficiently causally connected to an injury to satisfy *Britt*'s use requirement. *See, e.g.*, *State Farm Ins. Co. v. Bell*, 39 F. Supp. 3d 1352, 1354, 1358 (D.N.M. 2014) (concluding a dog bite injury from a dog sitting in a parked car arose while car "was being put to its normal use" because the owner was using the car to transport the dog); *Quarles v. State Farm Mut. Auto. Ins. Co.*, 533 So. 2d 809, 812 (Fla. Dist. Ct. App. 1988) ("The presence of the permanently attached gun rack in [the owner's] pickup truck established a significant causal connection between the use of the pickup truck and the accidental discharge of the shotgun."); *cf., e.g.*, *Kern v. Auto Owners Ins. Co.*, 526 N.W.2d 409, 412 (Minn. Ct. App. 1995) (concluding that the use of a truck to transport construction materials was normal use, not merely for storage, even where materials blew from the truck while parked, causing injury to a passerby).

**{16}**     Here, however, regardless of whether the storage of drugs presents a qualifying use, the stipulated facts do not permit a determination that the storage was sufficiently connected to Haygood's injuries. *Britt* guides our conclusion. The Court in *Britt* observed the vehicle's use for transportation may have been sufficiently causally connected to the injury only if the driver of the rear car were found to have collided with the forward car to facilitate the later attack. 1995-NMSC-075, ¶ 16. On the other hand, had the intent to attack developed independently of the collision, the attack would have severed any connection between the injury and the earlier qualifying use of the vehicle. *Id.* Applying these principles here, nothing in the record suggests the use of the car as storage facilitated Cordova's assault and nothing suggests Cordova even contemplated the assault in engaging in this use. *See id.* (noting intentional tort will generally sever connection between use and injury unless prior use facilitated tort). Instead, the stipulated facts compel our conclusion that the district court correctly determined Cordova's assault, coming as it did after and independent of the car's use for storage, severed any causal connection between the storage and Haygood's injuries. *See id.*

**{17}**     We conclude neither use identified here constituted a "normal use" sufficiently causally connected to Haygood's injuries. The district court thus did not err in determining as a matter of law that Haygood's injuries did not arise from the use of the uninsured vehicle and that Haygood's uninsured motorist policy did not cover his injuries. As a result, we affirm the district court's grant of summary judgment on Plaintiff's uninsured motorist claims for breach of contract and breach of the implied covenant of good faith and fair dealing.[1] Likewise, because Haygood concedes his

---

1The parties agreed in their summary judgment briefing that Haygood's claim for breach of the implied covenant of good faith and fair dealing depended on the existence of coverage. Defendants reiterated that position at the motions hearing, and Haygood did not object. The district court adopted that reasoning and having found no

claims under UIPA and UPA were predicated on coverage, we also affirm the grant of summary judgment on these claims.

## V.  The District Court Erred in Part in Dismissing Haygood's Bad Faith Claim

**{18}**  Haygood finally contends that regardless of whether he was entitled to coverage, he might still have prevailed on his bad faith claim relating to Defendants' investigation and evaluation of his claim. The district court disagreed and granted summary judgment on the bad faith claim, explaining that New Mexico law appeared to foreclose such claims in the absence of coverage. Based on our review of the law, we agree with Haygood on this point.

**{19}**  As a general rule, an insurer may deny coverage without exposure to a claim of bad faith failure to pay as long as it has reasonable grounds for the denial. *Am. Nat'l Prop. & Cas. Co. v. Cleveland*, 2013-NMCA-013, ¶ 13, 293 P.3d 954. Reasonable grounds will generally follow from reasonable investigation, and we have explained that an insurer is justified in taking reasonable time and measures to investigate before determining whether coverage is to be extended. *Id.* The investigation need not be perfect, but it must be "reasonably appropriate under the circumstances." *Id.* (internal quotation marks and citation omitted). Where an insurer fails to make an adequate investigation, its coverage position is unfounded, and it thus may be liable for bad faith denial of a claim. *Id.*; *see also* UJI 13-1702 NMRA (providing that denial for frivolous or unfounded reasons is bad faith).

**{20}**  At the same time, our Court in *O'Neel v. USAA Insurance Co.*, 2002-NMCA-028, 131 N.M. 630, 41 P.3d 356, explained that a record may "contain[] evidence to support a finding of bad faith . . . based on conduct separate from [the insurer's] refusal to pay[.]" *Id.* ¶ 9. Evidence of an excessive or unnecessarily invasive claim investigation, for example, might give rise to a claim of bad faith investigation regardless of the ultimate coverage determination. *See id.* And while *O'Neel* involved a situation in which the jury awarded the insured's claim in part, contrary to Defendants' contentions, there is nothing in *O'Neel* that appears to limit its bad faith analysis to cases where coverage is established. *See id.* ¶¶ 3, 5-11. Indeed, the jury instructions given in *O'Neel* made that clear. The instructions allowed the insured to establish bad faith by proving any of the following: the insurer's "reasons for refusing to pay were unfounded or frivolous," the insurer "did not act reasonably . . . to conduct a fair investigation," or the insurer "did not act reasonably . . . to conduct a fair evaluation of [the] claim." *Id.* ¶ 11. We concluded there was ample evidence that allowed the jury to find bad faith, regardless of whether the insured was ultimately justified in refusing to pay the full amount. *Id.* Thus, in *O'Neel*, we established that bad faith claims may be based on conduct other than a

coverage, dismissed Haygood's claim for breach of the implied covenant of good faith and fair dealing. The parties on appeal have not addressed whether this claim may have been viable regardless of coverage, and thus we give no consideration to that possibility here. *See, e.g., State v. Garnenez*, 2015-NMCA-022, ¶ 15, 344 P.3d 1054 ("We will not address arguments on appeal that were not raised in the brief in chief and have not been properly developed for review.").

refusal to pay. *See id.*; *see also Progressive Cas. Ins. Co. v. Vigil*, 2018-NMSC-014, ¶ 24, 413 P.3d 850 (citing *O'Neel* with approval).

**{21}**     Here, Haygood has advanced two distinct theories of bad faith. His first theory is simply that USAA exhibited bad faith in failing to pay a covered claim. This theory is unavailing because, as Defendants point out, we have regularly recognized that claims of bad faith failure to pay cannot "arise unless there is a contractual duty to pay under the policy[,]" and we have concluded Haygood has not established coverage in this case. *Charter Servs., Inc. v. Principal Mut. Life Ins. Co.*, 1994-NMCA-007, ¶ 17, 117 N.M. 82, 868 P.2d 1307. Thus, to the extent Haygood's bad faith claim depended on the existence of coverage, the district court did not err in dismissing it.

**{22}**     Haygood's second theory of bad faith, however, does not appear to be predicated on coverage. Instead, he contends Defendants "intentionally delayed the coverage decision, intentionally failed to fairly evaluate the claim, and dishonestly handled the claim to [their] advantage."[2] Haygood presented a variant of this argument to the district court and, as factual support therefor, advanced evidence that USAA's in-house counsel attempted to develop a conflicting account of the events and extended the investigation as a result, had suggested Hawken pursue various unsupported leads, and had eventually concluded USAA should deny coverage because Haygood made for an unsympathetic plaintiff. Defendants accepted these factual allegations as undisputed for purposes of summary judgment, steadfastly maintaining, as they do now on appeal, that Haygood could have no claim for bad faith in the absence of coverage. As we explained in *O'Neel*, however, a bad faith claim need not depend on the existence of coverage. 2002-NMCA-028, ¶ 11 (concluding conduct other than refusal to pay may support bad faith claim); *see also Vigil*, 2018-NMSC-014, ¶ 24 (citing *O'Neel* with approval for proposition "that a finding of bad faith may be based on conduct separate from refusal to pay").

**{23}**     We note, as we did in *O'Neel*, that Haygood might establish bad faith in a variety of ways—whether by proving Defendants failed to deal fairly in handling the claim, failed to conduct a fair investigation, or failed to fairly evaluate coverage, among other possibilities. *See O'Neel*, 2002-NMCA-028, ¶¶ 10-11 (noting the record supported finding of bad faith where there was evidence that the investigation was untethered to terms of the insurance policy and where the investigation was extended "without justification or support"); *see also Vigil*, 2018-NMSC-014, ¶ 24 (noting absence of fair dealing may support bad faith); UJI 13-1702 (setting forth theories of untimely and unfair investigation, unreasonable delay in notification, timely evaluation, and timely payment, among others). The facts Defendants have conceded here for purposes of summary judgment, coupled with reasonable inferences drawn therefrom, might, given a fuller

---

2To support his contention that the district court erred in dismissing the bad faith claim, Haygood additionally relies on the doctrine of "mend the hold"—which provides that a party cannot give a reason for conduct and then "after litigation has begun, put his conduct on another and different consideration"—pointing to the fact that USAA changed its reasons for denying coverage over time. *See Irwin v. Sovereign Camp of Woodmen of the World*, 1910-NMSC-023, ¶ 4, 15 N.M. 365, 110 P. 550. Because we reverse in part the district court's dismissal of Haygood's bad faith claim on other grounds, we need not address the applicability of this doctrine here.

consideration of the record, support a trial on the merits of Haygood's bad faith claim premised on Defendants' investigation and evaluation. *See Zamora v. St. Vincent Hosp.*, 2014-NMSC-035, ¶ 9, 335 P.3d 1243 ("drawing all reasonable inferences in support of a trial on the merits" in reviewing grant of summary judgment).

{24}   Accordingly, we conclude the district court misinterpreted New Mexico law when it foreclosed entirely Haygood's bad faith claim in the absence of coverage. We, however, do not speculate as to what the district court may have done in the absence of this error. *See Rummel*, 1997-NMSC-041, ¶ 16 ("[W]hen the [district] court's grant of summary judgment is grounded upon an error of law, the case may be remanded so that the issues may be determined under the correct principles of law."); *Archuleta v. Lacuesta*, 1999-NMCA-113, ¶ 17, 128 N.M. 13, 988 P.2d 883 (remanding for reconsideration of summary judgment where the district court had not given "full consideration" to potential independent ground presented by the parties). Such an inquiry is necessarily fact-dependent, which this Court is not well-situated to evaluate in the first instance, particularly in the absence of briefing from Defendants on the matter. *See Freeman v. Fairchild*, 2018-NMSC-023, ¶ 35, 416 P.3d 264 (counseling against undertaking "fact-dependent inquiry" on appeal); *Elane Photography, LLC v. Willock*, 2013-NMSC-040, ¶ 70, 309 P.3d 53 ("We will not . . . guess at what a party's arguments might be." (alteration, internal quotation marks, and citation omitted)). We therefore remand to the district court for determination of whether Haygood has made a showing sufficient to overcome Defendants' summary judgment motion on his bad faith claim premised on Defendants' investigation and evaluation.

## CONCLUSION

{25}   We affirm the district court's grant of summary judgment determining Haygood was not entitled to coverage and dismissing Haygood's claims for breach of contract, breach of the implied covenant of good faith and fair dealing, violations of UIPA and UPA, and bad faith based on failure to pay a covered claim. We reverse the district court's grant of summary judgment dismissing Haygood's claim of bad faith premised on Defendants' investigation and evaluation, and we remand for further proceedings consistent with this opinion.

{26}   **IT IS SO ORDERED.**

**JENNIFER L. ATTREP, Judge**

**WE CONCUR:**

**JULIE J. VARGAS, Judge**

**JAMES J. WECHSLER, Judge Pro Tempore**